The Honorable. The United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to Good morning Mr. Clarity. You may proceed. Good morning. May it please the Court. My name is Daniel Clarity. I am counsel for the defendant appellant Andres Perez. I'd ask with the Court's permission that I can reserve two minutes for rebuttal. You may. Thank you. In my limited time today I'd like again with the Court's permission to take our second argument first. Specifically I'd like to begin by addressing Mr. Perez's challenge to the District Court's determination that the visual body cavity search that was conducted by the officers of Mr. Perez's person was lawful. We contend as the Court knows that that decision was error. Now first there's no dispute that what happened here falls into the category of a visual body cavity search. It was more than a strip search. Mr. Perez was directed to drop his pants and underwear, bend over, and the detective lowered his head to look up towards his body and that was when the detective identified a small bag. Counsel, counsel, special appellant, I'd like to ask you a question that I think is really central to the analysis here. We talk about individualized suspicion in a case like this. So what is individualized suspicion of what? Is it individualized suspicion that he may be concealing drugs on his person generally? Or does it have to be individualized suspicion that he may be concealing drugs in his buttocks in this case? What is your position on that? Well, I guess I look to United States versus Barnes here and I think the Court requires that there be a particularized suspicion that this defendant, this particular defendant, is concealing contraband, I suppose, I assume it's assumed to be drugs but it could be anything, on his person. I think on his person. Now what makes it a visual body cavity search is that they're looking at his buttocks. I suppose he could be hiding it somewhere else that may not be as intrusive a search but there must be a particularized suspicion that this particular defendant is concealing contraband on his person. Let me ask you this, counsel. Sure. Do we know what was happening to this defendant? Was he going into the general population? Was he being put in a cell? Was he going to be let out on bail? What does the record show, if anything? The record does not show anything, your honor. That goes to really, the district court jumped to the Florence decision and based its ruling on Florence but I would submit that the record here does not establish any of those facts. Excuse me, counsel. I believe you just misrepresented what the district court held. It did, in fact, discuss Florence but then it held that there was reasonable individualized suspicion here and I was going to ask the same type of questions that Judge Torea did because I think the government's position has been confusing here as to whether the individualized reasonable suspicion is the standard or whether this is like the Florence case. You, in your reply brief, say the government never raised the Florence case in the district court. Is that correct? That's my, I believe that's correct. All right, we'll let the government answer that. Secondly, you say that the government failed to put on any evidence whatsoever as to whether he would be put in a general jail population, be put in an individual cell, whatever. Is that correct? That's correct, your honor. There's no evidence in the record about whether there's a, what type of holding cell there may or may not be in this location. There's no evidence, frankly, whether he would have been given bail or whether he might have even been issued a citation. Excuse me, he could not have been issued bail without some time being spent in the holding cell. Isn't that correct? I think that's, again, we don't know if there was a holding cell. The bail comes from an appearance. Well, before then, he's put in some form of holding cell. More likely than not, your honor, but there's no evidence here, and I believe the officers, I cited this in, I think, in our footnote under the Massachusetts statute, a bail commissioner could, there's simply no evidence. Were they going to issue a citation? Were they going to make a decision to hold him and have a bail determination? Where he was going to go, there's simply no evidence of that in the record. Is there any evidence? Given the quantity of drugs, it's unlikely a mere citation would have been issued. I'm sorry, Judge Lopez, go ahead. Well, if I may respond to that, your honor, of course, the drugs had not yet been found prior to the search. Counsel, is there any evidence in this record that the jail had a general policy relating to the administration of the jail that strip searches and body cavity searches would be done routinely before putting a defendant, a pretrial detainee, into the general population? There is no such evidence, your honor, in the record. There were questions about whether this type of search was conducted pursuant to local policy, but those questions actually don't answer the question of whether there was a policy that attached to a particular holding facility. I was under the impression that there's something in this court opinion that says that there was no such policy. Well, there were questions that I believe I asked that was this search of his person conducted pursuant to any policy in Revere. To be fair, I don't think that question was asking about whether there was a policy that attaches to a particular detention facility. It simply wasn't in the record, so I was asking that the question was whether there was any policy that supported the search. I guess I will say there's simply no evidence of any policy anywhere. In your view, who had the burden to put in that evidence? Well, I believe that the government had the burden of we challenged the search, and they need to present some evidence if they were going to support the search. The evidence they put in was the grounds that the officers used for the search. If there was some other basis for the search, such as he was going to enter into some general population, or that it was attached to some facility, the government should have put that in. There was no such evidence in the record. Or perhaps you should have put in that there was no policy. Well, there is evidence. I did ask that there was no policy. The search was not conducted to any policy. The officers both agreed to that. There was no policy that informed the search. I'm sorry, go ahead. An appellate 88, the following statement is made. Unlike in Florence, the Revere Police Department had no written or seemingly even unwritten end parenthesis policy about strip searches. That's a finding of fact. That's right, your honor. I agree with that, and I apologize if my prior response was confusing. What I was saying is that there was no separate evidence of some other policy connected to some detention facility, because there was no such evidence ever introduced. That's time. Wait a minute, Judge Leipitz, you had a question? Just very quickly, I mean, even if we were to conclude that the district court may have gotten the standard wrong in deciding whether this body cavity search was justified, and the district court doesn't seem to have any, doesn't even mention Barnes, which arguably is the case, wouldn't it be appropriate for us, cognizant of the proper standard, to do our own analysis of whether there was the requisite individualized suspicion here? Couldn't we do that? Your honor, I think you can. I think you're entitled to look at the record and make those decisions. I would submit here there simply is not sufficient, there are not sufficient facts to support individualized, particularized suspicion, especially the facts here are not that different from Barnes, but they're actually weaker than Barnes, because, and if I may continue, your honor, I know I'm out of time, but there, even in Barnes, there was a tip that said the defendant was known to cheat drugs, I think was the term, and even there, this court remanded for a determination of the reliability of that tip. Now, we don't even have that here. We simply have generalized suspicion, and that, you know, there may be some ability, or there may have been some concealment, and I simply think that's... You're not suggesting there has to be a tip of that kind in order to meet the individualized suspicion standard, are you? No, I'm suggesting that there needs to be some evidence to support the officer's conclusion that this defendant was concealing contraband, and that evidence is what's required, because we're dealing with the visual cavity body search, which has a higher standard. The court has looked, it's a sliding scale here, as there's a greater intrusion into privacy, there needs to be more particularized evidence, and I submit on this record, there is no such evidence. There's no individualized or particularized evidence. Thank you. Thank you. At this time, if Attorney Clarity would mute his device, and if Attorney Dave Vincentis could unmute and proceed. Good morning again, Your Honors. Alexia Dave Vincentis on behalf of the United States. To go directly to the body cavity search, I think I can begin by narrowing the scope of the inquiry a bit here, because to clarify any confusion, the government is not, in this case, relying on Florence to justify the search. We are preserving the possibility that in a future case, with fully developed facts regarding the arrestee's conditions of confinement, Florence might well call into question this court's prior precedent requiring that visual body cavity searches be justified by reasonable suspicion. But for purposes of this case, with this record, we are agreeing with the defendant that the reasonable suspicion standard applies. It is our view, however, that the standard was indeed satisfied. At the time of this search, the officers not only knew that Perez had a past, but the officers had also observed various factors that led them to believe, at the time of his arrest, that he was not only a drug dealer, but a drug dealer out making rounds. Those factors include the fact that, first, Perez had just been seen engaging from his vehicle in what officers recently believed to be a street-level drug transaction. Second, he had in his possession an individually wrapped baggie of suspected crack cocaine, a spare license plate, multiple cell phones, and $269 in various denominations, all of which were consistent with the notion of distribution beyond the transaction just observed. Counsel, I'd like to ask you about our... This goes to the question I posed to opposing counsel about its individualized suspicion of whether it's individualized suspicion that contraband may be concealed on the individual's person or, more specifically, in the intimate body cavity area. In our decision in Raspberry, February 2018 case, there is language that refers to an officer must, at a minimum, have reasonable suspicion that the person detained is hiding contraband there, there being a reference to the private body cavity area. Does that... Do you agree that that suggests that it's not enough to have individualized suspicion that contraband is concealed on the person, but it has to be more particular to the area of the private body part area at issue? I think that, for purposes of this case, we can agree that it has to be more specific to the body cavity area itself because we believe, in this case, that there was, indeed, reasonable suspicion to believe once the officers had conducted a pat-frisk and a surface-level, shall we say, search incident to arrest, they had not found drugs and, at the same time, had a reasonable belief that he would likely to have additional drugs somewhere leading to the inference that they would be found in the body cavity. Now, Judge Troy, you look like... I have a question, but it may be an interruption of what you were saying, so if you're finished, I'll ask it. Well, I was going to continue along the process of explaining why it is that we believe that, in this case, not only was it likely that Perez had additional drugs, but that, in fact, given that those drugs were not found on his person or in the vehicle, they were likely to have been concealed off his person. Okay, then I think I will ask my question at this point. Now, you will agree that a body cavity search is about as intrusive a thing as you can make on a detainee, would you not? Of course, Your Honor, yes, we would agree. Now, thinking in terms of other situations in which there are such intrusions, like, for example, the cases where smugglers will swallow these, basically, condoms full of drugs, usually before you can engage in entering their body in any way to get these items, you need a court order. Am I correct? Well, I think that, in this case, the Barnes decision... Let's go one point at a time, because if you show me that I'm wrong, I'll stop asking the question. Well, I'm not currently steeped in that particular area of the law. I won't disagree that there are certain circumstances in which more is required, but I have more than reasonable suspicion. Let me get to the point. I was thinking, what would be the problem where, if you're going to do a body cavity search, you need a court order rather than just do it on your own? Well, I think the Barnes decision, first of all, forecloses the notion that more than reasonable suspicion is required, Your Honor, and I would also point out that at no point in his opening brief or reply has the defendant argued that anything greater than reasonable suspicion applies. Well, I know about the Barnes opinion because I think I wrote it, if I'm not mistaken, but I think we've progressed somewhat since then, and how much of a problem would it be to require that a court order be gotten? Judge Turek, I believe that line of cases refers to orders to pump the stomach of suspects who have swallowed and has never been extended to a cheek search. Well, I'm familiar with what they are, but the fact is that the reason why those cases exist is because they involve a massive or a very big intrusion into the body of the person. I think that the case law actually draws distinctions concerning the degree of the intrusion. For example, a vaginal search of a female detainee is obviously more intrusive than a look between the cheeks of buttocks. I'm simply struggling to see why the Barnes case does not control here. Well, I still would like to hear the governor's answer. Well, I trust that Judge Lynch is more fully steeped in that line of case law than I perhaps am. It sounds to me, based on her description of the facts in those cases, that they do indeed involve a greater level of intrusion than the viewing of the buttocks area that we are talking about here. Not to beat a dead horse, but I do believe that the Barnes decision, particularly when coupled with what I would argue is the defendant's waiver, forecloses any suggestion that anything other than reasonable suspicion should apply in this case. Can I ask about an assertion in your brief? You assert in your brief that the officer who stopped the car and the passenger in the car took off running and eventually tossed a gun away during that period of distraction and while they were attempting to find out if this driver who they stopped, the defendant, had a criminal record. You assert that the officer thought that was more than adequate time for him to hide the baggie of drugs in his buttocks. That's the way I read your brief. The argument that we were attempting to advance there didn't relate specifically to the period of time during which the passenger of the car took off running and The period of time that we were referring to is the period of time during which this individual was believed to have understood that he was being followed, which was during the period of time in which he engaged in what the district court appropriately, we believe, found to be a circuitous route, a route that didn't point from A to B, but rather, if continued, would have effectively amounted to the driver going in a circle right back to where he started. Counsel, Mr. Perez was the driver of the vehicle, is that correct? That's correct, yes. And the small bag of cocaine was found on the floor of the car on the driver's side, is that correct? That is correct, yes. So what are you suggesting that it's a reasonable inference from that that he had been attempting to conceal that bag or bags like that on his person and was unsuccessful to the extent that one was found on the floor, but that supports the inference that there might well be additional bags on his person and perhaps more specifically in his buttocks. Is that the chain of reasoning that you're urging? I think that is indeed a fair inference to be drawn. Given where these drugs were found, one could reasonably conclude that the individual baggie was dropped as he was trying to conceal drugs in his buttocks area. I don't think, though, that that inference is a necessary one to the finding of reasonable suspicion. It may well have been the case, for example, that this individual was driving around carrying the drugs in that concealed position just as a matter of course, and you would still have nonetheless various indicia pointing towards reasonable suspicion that the drugs could be hidden in the buttocks area. Specifically, you have the fact that Perez had both again the motive and opportunity to conceal drugs during the period of time that he was driving with the seeming understanding that he was being followed. You have the fact that he and his passenger were then seen taking steps consistent with concealing evidence. For example, they were seen manipulating cell phones as the officers were approaching the a firearm. Well, I think that when you combine the fact that this individual was reasonably believed to have had additional drugs beyond just the individualized baggie on the driver's side floor, and the fact that he had the motive and opportunity to conceal those drugs, and there was no stash. Unlike in Barnes, there was no stash found in the vehicle. That all led the officers reasonably to conclude that a search of the anal capity area would be fruitful. Unless there are further questions, the government would rest on its brief. Thank you. Thank you, AUSA. If attorney Clarity could please unmute his device. You have two minutes of rebuttal, sir. Sure. First, there was a suggestion somehow that there was some waiver by the defendant. I'm not sure what the government was alluding to. We've been clear in our brief and below that here with a visual body cavity search, the standard that's set forth in Barnes. So I don't think anything's been waived in connection with that, and I'm not sure I understand. The other thing I want to mention, Barnes itself, in Barnes, there was evidence of opportunity to conceal. There was specific testimony, actually more testimony than there was in this case, specific testimony from the officer that there was time where the defendant could have concealed drugs, and yet this court concluded not sufficient, insufficiently particular. I also wanted to go back. Maybe I was somewhat inept. I may have been in response to Judge Lopez's prior question. What makes this, what heightens the standard is the search of the intimate area. So while if the contraband is somewhere else on the body, presumably it could be found by something that would be a more standard visual strip search, by focusing on the intimate area, that's where the standard becomes a sliding scale and is a more particularized requirement. I don't understand that argument. I just want to be sure I comprehend. He was asked to drop his trousers and his underpants. Are you saying that if he had been told to entirely strip and stood naked in front of the officers, and they walk around him and look at him, that they would not have seen a baggie? Is that your contention? The officers identified the baggie after he was asked to bend over. Yes, but you haven't answered my question. It's true that he was asked to bend over, but it's a little, it strikes me as improbable that if he was standing there naked and was told to either bend forward or spread his legs, that nothing would have been seen. Did you ask those questions? I think it was, I think what the evidence is pretty clear that nothing was seen until he was asked to bend over and the officer lowered his head to inspect the intimate area of Mr. Perez, so I don't think there's any evidence that a simple strip search would have revealed what was revealed here. It was a visual body cavity search that included him bending over and the officer lowering his head below his buttocks. As I understood the government, they were saying, look, a pat and frisk without any dropping of clothing would not have found contraband, and that is what justifies the further search, because there was a strong suspicion that there were other drugs and they were on his person, because he was a drug dealer and there were no drugs found in the car other than this individual sale baggie. What's the response to that? The response to that is that that could justify a strip search, but not a visual body cavity search. In order to support a visual body cavity search. I'm sorry, so you're saying in a strip search they couldn't have told him to bend over? To bend over and to inspect. They can't then inspect his buttocks. An officer walking around him can't lower his head to look. To inspect. Is that your argument? Well, in combination with bending over and a visual inspection of his buttocks. Under Barnes, that is a visual body cavity search, which requires height more. It's the individualized reasonable suspicion, and you have agreed that this court does not need to remand. This court can make the decision. Is that correct? I do think that this court has under Barnes has the authority to review the record. You did not in your reply brief. Suggest anything other than what I have just said. I think that's correct, Your Honor. OK. Also, wasn't he asked to spread his cheeks? He was asked to bend over. I don't think there's specific testimony about him spreading his cheeks, but there is the lowering of the officer's head to look up into his orifices, I guess, is how I'll say it. How was the baggie retrieved? Did the officer then manually reach into his buttocks to retrieve it? Did he then pull the baggie out himself? The officer retrieved it. At that point, he's seen the packaging, so I'm not challenging that phase of it because what matters is the visual body cavity search. Once he sees the baggie, I don't think I have an argument that prevents him from retrieving the baggie unless it was retrieved in some harsh way. I'm not suggesting that. OK. Just a quick follow-up. How do you, in response to Judge Lynch's question, what transforms a script search into a body cavity search in a situation like this? I took it from your answer that if it becomes something more than a script search, if the individual is told to bend over and spread his cheeks, at that point, it has become more than a script search. Is that your position? It is, I think, in combination with the officer himself bending over and a close inspection of his buttocks. I think it's that in combination. I think the government agrees with me in their brief. There is no question it falls into that middle category that this court has repeatedly recognized of a visual body cavity search. The government is not trying to portray this as simply a script search. Is that correct? That's correct. They are clear. They've agreed with us that it is a visual body cavity search. They just think there's a particularized suspicion here. We dispute that there's sufficient under Barnes, that there simply isn't. If there aren't more questions, I can stop, but I'll answer whatever the court wants. Thank you. Thank you. That concludes argument in this case.